# APPEAL NO.: 24-13498-F

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

**UNITED STATES OF AMERICA**,

PLAINTIFF-APPELLEE,

v.

**VICTOR DIEGO ESTRADA**,

DEFENDANT-APPELLANT.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION
CASE NO.: 3:23-CR-00024-TES-CHW-1

---

## Appellant's Initial Brief

_____

Jonathan Dodson
Assistant Federal Defender
Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail: jonathan_dodson@fd.org
Appellate Counsel for Estrada

*U.S. v. Estrada*, 24-13498

**Appellant's Certificate of Interested Persons and Corporate Disclosure Statement**

The undersigned appellate counsel of record for Appellant, Victor Diego Estrada, in compliance with Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, certifies that the following listed persons and parties have an interest in the outcome of this case:

**Booker, C. Shanelle**, Acting United States Attorney for the Middle District of Georgia;

**Conway, Byron L., Jr.**, Executive Director for the Federal Defenders of the Middle District of Georgia, Inc.;

**Dodson, Jonathan**, Appellate Attorney for Defendant-Appellant, Victor Estrada, Assistant Federal Defender for the Federal Defenders of the Middle District of Georgia, Inc.;

**Estrada, Victor Diego**, Defendant-Appellant;

**Leary, Peter D.**, Former United States Attorney, Middle District of Georgia;

**Morrill, Michael P.**, Assistant United States Attorney, Middle District of Georgia;

**Morrison, Mike**, Assistant United States Attorney, Middle District of Georgia;

**Schieber, Michelle**, Assistant United States Attorney, Middle District of Georgia;

C1 of 2

**Self, Tilman E., III**, District Court Judge, United States District Court, Middle District of Georgia;

**Walker, Stuart**, Assistant United States Attorney for the Middle District of Georgia;

**Weigle, Charles H.**, United States Magistrate Judge, Middle District of Georgia;

**Williams, Catherine M.**, Trial Attorney for Defendant-Appellant, Victor Estrada, Senior Litigator for the Federal Defender for the Federal Defenders of the Middle District of Georgia;

**Victims:** There are no identifiable victims in this case; and,

No publicly traded company or corporation has an interest in the outcome of this appeal.

## Statement Regarding Oral Argument

Estrada requests oral argument, which would be helpful to the panel in resolving the issues presented by this case.

**Table of Contents**

STATEMENT REGARDING ORAL ARGUMENT ........................................................... i

TABLE OF CONTENTS ................................................................................................ II

TABLE OF AUTHORITIES ......................................................................................... IV

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ....................... 1

STATEMENT OF THE ISSUES ...................................................................................... 2

STATEMENT OF THE CASE .......................................................................................... 3

I.    FACTS AND PROCEDURAL HISTORY ................................................................ 3

    a.    Charges, Guilty Plea, Judgment and Sentence .......................................... 3

    b.    Facts Stipulated During Change of Plea Hearing ....................................... 3

    c.    Relevant Conduct ...................................................................................... 5

    d.    Sentencing Range Recommended by Presentence Investigation Report........................................................................................................ 6

    e.    Objections to Presentence Investigation Report........................................ 7

    f.    Response to Objections .............................................................................. 8

    g.    Defendant's Sentencing Memorandum .................................................... 10

    h.    Sentencing Hearing.................................................................................. 12

II.    STANDARDS AND SCOPES OF REVIEW ............................................................ 14

SUMMARY OF ARGUMENT ..................................................................................... 16

ARGUMENT................................................................................................................ 18

I.    THE DISTRICT COURT ERRED IN APPLYING THE DANGEROUS WEAPON ENHANCEMENT UNDER U.S.S.G. §2D1.1(b)(1) BASED ON APPLICATION NOTE 11(A), WHICH, IN EXPANDING "POSSESS" BEYOND ITS NORMAL LEGAL MEANING, DOES NOT RESOLVE A GENUINELY AMBIGUOUS PART OF THE GUIDELINE.................................................................................. 18

    A.    Deference to Guidelines Commentary..................................... 19

    B.    *Kisor* Standard of Deference .................................................. 20

    C.    *Dupree*'s Application of *Kisor* to Former Application Note 1 to U.S.S.G. §4B1.2 .................................................................... 21

    D.    Application Note 11(A) Should Not Receive Deference ......................... 22

    E.    The Proffered Evidence Does Not Show Estrada Constructively Possessed the Firearm ............................................................. 26

II.   THE DISTRICT COURT ERRED IN FAILING TO APPLY THE TWO-LEVEL REDUCTION UNDER U.S.S.G. §4C1.1 APPLICABLE TO OFFENDERS WITH ZERO CRIMINAL HISTORY POINTS. ................................................................ 32

CONCLUSION ...................................................................................... 38

CERTIFICATE OF COMPLIANCE ............................................................ 40

CERTIFICATE OF SERVICE...................................................................... 41

iii

# Table of Authorities

## Cases

*Auer v. Robbins*,
519 U.S. 452 (1997) ............................................................... 19, 20, 21

*Dep't of Homeland Sec. v. MacLean*,
574 U.S. 383 (2015) .................................................................... 22

*Kisor v. Wilkie*,
588 U.S. 558 (2019) ................................................. 19, 20, 21, 23, 25

*Pinkerton v. United States*,
328 U.S. 640 (1946) .................................................................... 30

*Silberman v. Miami Dade Transit*,
927 F.3d 1123 (11th Cir. 2019) ..................................................... 26

*Stinson v. United States*,
508 U.S. 36 (1993) ............................................................. 19, 20, 25

*United States v. Boykins*,
380 F. App'x 930 (11th Cir. 2010) ................................................. 10

*United States v. Carillo-Ayala*,
713 F.3d 82 (11th Cir. 2013) ........................................................ 34

*United States v. Dupree*,
57 F.4th 1269 (11th Cir. 2023) ......................................... 19, 20, 21, 22

*United States v. Gallo*,
195 F.3d 1278 (11th Cir. 1999) ..................................................... 25

*United States v. Garcia-Jaimes*,
484 F.3d 1311 (11th Cir. 2007) ................................................. 26, 31

*United States v. Gunn*,
369 F.3d 1229 (11th Cir. 2004) ..................................................... 27

*United States v. Hall*,
46 F.3d 62 (11th Cir. 1995) ...................................................... 18, 19

*United States v. Isnadin*,
  742 F.3d 1278 (11th Cir. 2014) ...................................................................27, 31

*United States v. Lange*,
  862 F.3d 1290 (11th Cir. 2017) ........................................................................ 22

*United States v. Perez*,
  661 F.3d 568 (11th Cir. 2011) .......................................................... 23, 28, 30, 31

*United States v. Pham*,
  463 F.3d 1239 (11th Cir. 2006) .................................................................9 ,10

*United States v. Shamsid-Deen*,
  61 F.4th 935 (11th Cir. 2023) ........................................................................ 15

*United States v. Smith*,
  480 F.3d 1277 (11th Cir. 2007) ...................................................................... 15

*United States v. Villareal*,
  613 F.3d 1344 (11th Cir. 2010) ...................................................................... 31

*United States v. Zavalza-Rodriguez*,
  379 F.3d 1182 (10th Cir. 2004) ...................................................................... 36

**Statutes**

18 U.S.C. § 3231 .......................................................................................... 1

21 U.S.C. § 841(a)(1) ...................................................................................1, 3

21 U.S.C. § 841(b)(1)(A)(viii).........................................................................1, 3

21 U.S.C. § 846...........................................................................................1, 3

28 U.S.C. § 1291 .......................................................................................... 1

## Other Authorities

"possess," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, available at: https://ahdictionary.com/word/search.html?q=possess (last visited Feb. 26, 2025) ....................................................................................23, 24

## Rules

11th Cir. R. 32-4 ............................................................................. 40

Fed. R. App. P. 32 ........................................................................... 40

## United States Sentencing Guidelines

U.S.S.G. §1B1.3(a) ....................................................16, 17, 23, 24, 25, 35, 37

U.S.S.G. §1B1.3(b) ...................................................................17, 35

U.S.S.G. §2D1.1 cmt. n. 8(D) .................................................... 6

U.S.S.G. §2D1.1(a)(5) ............................................................. 6

U.S.S.G. §2D1.1(b)(1) ..................................2, 7, 9, 16, 18, 19, 22, 23, 24, 33, 34, 37

U.S.S.G. §2D1.1(b)(12) ......................................................... 7

U.S.S.G. §2D1.1, cmt. n. 11(A) ........................... 2, 16, 18, 19, 21, 22, 23, 24, 25, 32

U.S.S.G. §3A1.1 ................................................................... 34

U.S.S.G. §3A1.4 ................................................................... 34

U.S.S.G. §3A1.5 ................................................................... 34

U.S.S.G. §3B1.1 ...............................................................33, 34

U.S.S.G. §4B1.2(a)(1) .......................................................... 21

U.S.S.G. §4B1.2(b) ......................................................19, 21, 22

U.S.S.G. §4C1.1 ....................................................2, 7, 8, 27, 32, 33, 38

U.S.S.G. §4C1.1(a)(3) .......................................................... 33

U.S.S.G. §4C1.1(a)(10) ................................................................33, 34

U.S.S.G. §4C1.1(a)(5) ...................................................................... 33

U.S.S.G. §4C1.1(a)(7) ..........................................7, 17, 33, 34, 35, 36, 37

U.S.S.G. §4C1.1(a)(9) ...................................................................... 34

U.S.S.G., Ch. 5, Pt. A .................................................................... 7

**Statement of Subject Matter and Appellate Jurisdiction**

This is a direct appeal in a criminal case from the October 9, 2024, amended judgment, which convicted Estrada of conspiring to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(viii), and possessing with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(viii), and imposed a 300-month imprisonment term. R37 at 1-2. The District Court had jurisdiction under 18 U.S.C. § 3231. Estrada timely filed a notice of appeal on October 22, 2024. R40. This Court has jurisdiction based on 28 U.S.C. § 1291.

**Statement of the Issues**

I.    THE DISTRICT COURT ERRED IN APPLYING THE DANGEROUS WEAPON ENHANCEMENT UNDER U.S.S.G. §2D1.1(b)(1) BASED ON APPLICATION NOTE 11(A), WHICH, IN EXPANDING "POSSESS" BEYOND ITS NORMAL LEGAL MEANING, DOES NOT RESOLVE A GENUINELY AMBIGUOUS PART OF THE GUIDELINE.

II.   THE DISTRICT COURT ERRED IN FAILING TO APPLY THE TWO-LEVEL REDUCTION UNDER U.S.S.G. §4C1.1 APPLICABLE TO OFFENDERS WITH ZERO CRIMINAL HISTORY POINTS.

2

**Statement of the Case**

I.    Facts and Procedural History

a.  Charges, Guilty Plea, Judgment and Sentence

A grand jury convened in the Middle District of Georgia returned a two-count indictment, charging Estrada with conspiring to possess with intent to distribute 500 grams or more of a methamphetamine mixture, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1) & (b)(1)(A)(viii) (Count One); and with possessing with intent to distribute 500 grams or more of methamphetamine mixture in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1) & (b)(1)(A)(viii) (Count Two). R1. He entered a guilty plea to both counts, without a plea agreement with the government. R25. The District Court convicted him on both counts, found that the imprisonment range advised by the United States Sentencing Guidelines was 262 to 327 months, R38 (statement of reasons), and sentenced him to a 300-month prison term. R37 (judgment) at 2.

b.  Facts Stipulated During Change of Plea Hearing

For purposes of establishing a factual basis in support of his admission to the elements of the charged conspiracy, Estrada agreed with the Government to the following facts: he agreed that a police task force investigation led to a residence on HighTower Trail in Oxford, Georgia ("the Hightower house"). R45 (transcript of

change of plea hearing) at 10:21 – 11:2. They executed a search warrant of the house, finding 21 bags of 99 percent pure (plus or minus 7 percent) methamphetamine that weighed a total of 26.85 kilograms, two cell phones, paraphernalia, and equipment associated with converting methamphetamine from liquid to solid form. *Id*. at 11:3-16.

They executed a search warrant of the cell phones, and found communications discussing converting liquid methamphetamine, and a communication between Estrada and a real estate agent regarding the lease of a house on Murray Lake Circle in Forest Park, Georgia ("the Murray Lake house"). *Id*. at 11:17 – 12:4. This communication indicated Estrada co-signed a lease of this house along with another man, three months prior. *Id*. at 12:4-7.

Three days after the search of the Hightower house, they executed a search warrant of the Murray Lake house, which was unoccupied at the time. *Id*. at 12:8-11. They found over 150 kilograms of crystal methamphetamine, equipment related to converting methamphetamine from liquid to solid form, and a loaded handgun on an air mattress in a bedroom. *Id*. at 12:11-19. Estrada denied knowledge or possession of the gun. *Id*. at 12:19-20.

Estrada admitted that these facts were true and that they established beyond a reasonable doubt his guilt of possessing with intent to distribute methamphetamine and conspiring to do the same. *Id*. at 12:21-25.

c.  Relevant Conduct

The undisputed assertions of Estrada's presentence investigation report ("PSR") stated the following: two parallel investigations led authorities to the Hightower house. R32 (PSR), at ¶4. The DEA learned of the house from a confidential source ("CS") connected to a Mexico-based narcotics broker, while a DeKalb County Task Force somehow learned of the house after they saw Estrada making suspicious purchases at Home Depot – of large plastic bins, duct tape, trash bags, and pine straw. *Id*.

The CS bought 941.6 grams of 94 percent pure methamphetamine from Estrada on November 8, 2023. *Id*. at ¶5. Shortly thereafter, authorities saw Estrada travel to three separate Wal Marts and purchase coolers. *Id*. at ¶6.

On November 14, 2023, the DEA executed a search warrant of the Hightower house and arrested Estrada, who was the only person there. *Id*. at ¶7. They found in a back bedroom 21 vacuum sealed bags containing a total of 21,087.5 grams of 99 percent pure methamphetamine, "equipment commonly used in the process of converting liquid methamphetamine into a crystal or solid form[,]" and two cell

5

phones. *Id*. A search of the cell phones revealed messages that agents believed connected Estrada to other houses where persons were processing and storing methamphetamine. *Id*. at ¶8. It also showed Estrada and another man had signed a lease for the Murray Lake house, three months before the controlled buy. *Id*

They executed a search warrant of the Murray Lake house on November 17, 2023, finding 188 kilograms of suspected crystal methamphetamine, some liquid methamphetamine, and four kilograms of a substance that tested positive for both cocaine and fentanyl. *Id*. at ¶9. They also found "equipment commonly used in methamphetamine conversion laboratories," and on top of an air mattress in one of the bedrooms, a loaded 9mm handgun and a spare 9mm magazine. *Id*. at ¶10.

d.  Sentencing Range Recommended by Presentence Investigation Report

The PSR recommended a base offense level of 38, applicable to offenses involving over 90,000 kilograms of converted drug weight. *Id*. at ¶23; *see* U.S.S.G. §2D1.1(a)(5) & (b)(1). It calculated the converted drug weight based on the Drug Conversion Table in Application Note 8(D) to §2D1.1 as follows:

| Drug Quantity | Conversion Factor | Converted Drug Weight |
|---|---|---|
| 21,818.2 g actual methamphetamine | 1 g actual methamphetamine = 20 kg converted drug weight | 436,364 kg |
| 188,000 g methamphetamine | 1 g methamphetamine = 2 kg converted drug weight | 376,000 kg |

6

| 4,000 g fentanyl | 1 g fentanyl = 2.5 kg converted drug weight | 10,000 kg |
|---|---|---|
| TOTAL CONVERTED DRUG WEIGHT | | 822,374 kg |

*Id*. at ¶21. It recommended increasing Estrada's offense level by four: two levels based on §2D1.1(b)(1) because a loaded firearm was possessed in connection with the offense, and two levels based on §2D1.1(b)(12) for maintaining a premises for the purposes of manufacturing or distributing a controlled substance. *Id*. at ¶¶ 23-24. It also recommended subtracting three levels for timely acceptance of responsibility. *Id*. at ¶¶ 31-32.

His total offense level was thus 39. *Id*. at ¶33. He had zero criminal history points, making his criminal history category I. *Id*. at ¶¶ 36-38. However, the PSR advised that he would not qualify for a two-level reduction applicable to offenders with zero criminal history points, *see* U.S.S.G. §4C1.1, since "he possessed a firearm in connection with the offense." This made his recommended imprisonment range 262 to 327 months. *See* U.S.S.G., Ch. 5, Pt. A.

    e.  Objections to Presentence Investigation Report

Estrada objected to the enhancement for possessing a firearm in connection with the offense. R29 at 102. He argued that the firearm was not found until three days after he was taken into custody, there was no evidence that he ever physically possessed the firearm, and, unlike the retail stores and the Hightower house, he

7

had never been observed at the Murray Lake Circle house where the firearm was found. *Id*. at 1. The documentation and mail recovered at the Murray Lake Circle house suggested several people visiting and possibly living at this house, but none of this evidence pertained to him. *Id*. at 2. His only connection to the Murray Lake Circle house was that he was listed on the lease along with another person. *Id*. Finally, the firearm was purchased by someone named Courtney Blackburn who Estrada did not know. *Id*.

He also objected that the Court should reduce his offense level by two under U.S.S.G. §4C1.1, because he had zero criminal history points. *Id*. If the court sustained his objections, his total offense level would be 35, making his Guideline range 168 to 210 months. *Id*.

   f.   Response to Objections

In response the government recited many of the facts stated in the PSR, adding some details by way of proffer. R30. It described how the CS set up the November 8 methamphetamine deal with a Mexican "broker," who directed Estrada to a gas station parking lot to consummate the deal. *Id*. at 1-2. It described how Estrada had appeared to check under his car for a tracking device before leaving one of the Wal Marts. *Id*. at 4. It claimed that cell phones contained messages describing the methamphetamine conversion process, and "[a]gents

8

gleaned" from the messages that the methamphetamine was stored in "multiple houses." *Id*. It contended that the phones also contained messages with a listing agent about renting the Murray Lake Circle house. *Id*. at 4-5. Specifically, in response to a request for the identification of the individuals who would live there, Estrada sent photographs of his identification, of an identification belonging to "Carlos Galindo Mondragon," and of an "identification card for a third male." *Id*. at 5. And it recounted the results of the searches of the two houses, including the recovery of the handgun in a bedroom of the Murray Lake Circle house.  *Id*. at 4-7.

The government argued that the firearm enhancement of §2D1.1(b)(1) should apply if any co-conspirator possessed a firearm, reciting following test: " '(1) the possessor of the firearm was a co-conspirator; (2) the possession was in furtherance of the conspiracy; (3) the defendant was a member of the conspiracy at the time of the possession; and (4) the co-conspirator possession was reasonably foreseeable by the defendant.' " *Id*. at 8 (quoting *United States v. Pham*, 463 F.3d 1239, 1245 (11th Cir. 2006)). It further quoted " '[t]he firearm adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense,' and '[o]nce the government shows that a firearm was present, the evidentiary burden shifts to the defendant to show that a connection between the firearm and the offense is clearly improbable.' " *Id*.

9

quoting *Pham*, 463 F.3d at 1245). It also relied in *United States v. Boykins*, 380 F. App'x 930 (11th Cir. 2010). It explained that both of these cases involved firearms possessed by co-conspirators, and in both cases the Eleventh Circuit found that their possession was reasonably foreseeable. *Id*. at 8-9, n.5.

It reasoned that since Estrado's name was on the lease, he had access to the house. *Id*. at 9. "Clearly, the Taurus pistol was possessed by Estrada, a co-conspirator, or jointly by all." *Id*. Furthermore, given the vastness of conspiracy, the connection between the firearm and the drugs was "common sense[.]" *Id*. at 9-10.

g.  Defendant's Sentencing Memorandum

Defense counsel filed a memorandum providing a background on Estrada. He was raised along with his three sisters by his mother in small Mexican house without running water. R 31 at 1. The family struggled financially, but his mother worked hard and kept them fed. *Id*. He was not able to meet his father until he was 15 years old, because his grandfather had disapproved of him. *Id*. at 2. Instead, he was raised by a violent, alcoholic stepfather, who later worked in the United States and sent them money. *Id*. Estrada dreaded the holidays, because his stepfather would come home, get drunk, and beat his mother. *Id*. Based on his stepfather's example, he has avoided alcohol completely throughout his life. *Id*. at 7.

10

He completed school and began working full time at 14 years old in nance orchards, which are small bitter fruits. *Id*. at 3. He later transitioned to avocado fields and other agricultural jobs, earning just enough wages to support his family. *Id*. He particularly enjoyed his work in the Forestry Department, where he cut down trees that had been damaged by fire. *Id*. at 4.

He got married and had his son, Ian, in 2017. *Id*. at 5. His wife had been a schoolteacher, but quit to care for their son. *Id*. at 6. As a baby, Ian frequently became ill, and their medical bills piled up. *Id*. This led Victor to go to the United States. *Id*. He entered illegally, first working at an onion farm in Texas, before moving to Georgia and working as a day laborer. *Id*. at 6-7. There, he met a fellow laborer who offered him a cheaper place to stay, which ultimately led to his involvement with the methamphetamine conspiracy. *Id*. at 7.

Estrada had dreamed of building a house and making a stable future for his family. *Id*. He deeply regretted his decision to involve himself in the drug trade. *Id*.

He submitted 12 letters of support and other documents. Numerous old friends of Estrada's noted his personal integrity, friendliness, responsibility, respect, honesty, peacefulness, work ethic, lack of vices, and commitment to family. R31-1 at 1 – 9, 11 – 18, 23 – 24. His sister Casandra looked up to him as a father figure, and said he was an "excellent brother, son and above all a very good

11

father." *Id*. at 9 – 10. His mother described him as "a good boy always helping others with what they needed, he never got into trouble, nor in matters of any kind of fights[.]" *Id*. at 19 – 20. His wife echoed these qualities, emphasizing that he was a loving, responsible father and [was] dedicated to his family[.]" *Id*. at 21 – 22. The General Manager of Pacific Fruit wrote to explain that Estrada had worked for him from January 2021 to December of 2022 and had proven to be "an efficient, responsible, honest person of good conduct[.]" *Id*. at 25 – 26. Estrada also attached a letter from a local official attesting to his origin in the Municipality of Gabriel Zamora, Michoaca, Mexico, an official document containing his personal information believed to be a Mexican military conscription ID, his birth certificate, and his marriage license. *Id*. at 27 – 34.

h.  Sentencing Hearing

At the sentencing hearing, defense counsel emphasized that Estrada did not live at the Murray Lake Circle house, that the house contained mail involving numerous people, and that  Estrada clearly lived at a separate residence, where no firearms were found. R46 at 4:3-9. The government recited some of the facts, including that the Murray Lake Circle house was leased in Estrada's name. *Id*. at 4:25 – 5:16. Whether the firearm "was possessed by him or a co-conspirator, the law is clear it does not matter, that he should be assessed the two-level penalty."

12

*Id*. at 5:21-24. The court overruled the objection, saying "the law is clear that if a co-conspirator possessed that then you can assess the firearm enhancement. I think he's done and I don't think that he's shown that it's clearly not [sic] improbable that he had a gun." *Id*. at 6:2-6.

The government asked for a sentence "at the top of the guideline range or close thereto." *Id*. at 6:24. He explained it was "a serious case" involving "a Mexican drug cartel who took up shop" in Georgia. *Id*. at 6:12-15. He speculated that the rubber bins found in a third house buried under the crawlspace "were cleaned out before police could come and seize what invariably would have been methamphetamine." *Id*. at 6:18-21.

Defense counsel requested a downward variance sentence. She explained that Estrada had only recently come to the United States, after working in Mexico in orchards and for the forestry department. *Id*. at 7:7-10. His motivation to come to the United States was to support his family, including his young son, Ian. *Id*. at 7:10-11. She acknowledged the seriousness of the offense and the "substantial quantity of drugs," and added that Estrada deeply regretted his involvement. *Id*. at 7:2-4, 21-22. In allocution, Estrada said simply "I am so sorry, Your Honor." *Id*. at 8:3.

The District Court acknowledged the "glowing letters" of support submitted by defense counsel. *Id*. at 8:6-7. But that did not excuse his illegal entry into the country, and it would not overlook his involvement with methamphetamine "which is just killing our country and killing our communities[.]" *Id*. at 8:7-11. The court was unconvinced that Estrada was motivated merely to help his family. *Id*. at 8:12-14. It then adjudicated Estrada guilty, recited the Guidelines imprisonment range, stated that it had considered the sentencing factors of 18 U.S.C. § 3553(a), imposed a 300-month prison sentence, and ordered him deported after he served his sentence. *Id*. at 8:17 – 9:7.  It explained that its decision was driven by "the nature and circumstances of the offense and the history and characteristics of the Defendant." *Id*. at 9:25 – 10:2.

Defense counsel thereafter objected that the sentence was greater than necessary, explaining "the nature and circumstances of Mr. Estrada actually cut the other way in that he has . . . no criminal history." *Id*. at 10:17-19. The court interpreted this to be a substantive reasonableness objection, and counsel confirmed that it was. *Id*. at 10:21-25.

II.    Standards and Scopes of Review

This Court  "review[s] a district court's interpretation  and application of the Sentencing Guidelines *de novo* and its factual findings for clear error." *United States*

14

*v. Smith*, 480 F.3d 1277, 1278 (11th Cir. 2007). This Court also reviews *de novo* the mixed questions involving the application of the law to a particular set of facts. *United States v. Shamsid-Deen*, 61 F.4th 935, 945 (11th Cir. 2023). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

A party's failure to raise a particular legal argument below in support of a legal objection does not change the *de novo* standard of review. In *United States v. Dawson*, 64 F.4th 1227, 1239 (11th Cir. 2023), this Court rejected the government's contention that it review for plain error Dawson's reliance on the rule of lenity, which he raised for the first time on appeal. It explained " 'parties cannot waive the application of the correct law or stipulate to an incorrect legal test.' " *Id*. It continued "a party cannot waive lenity any more than it can waive the plain meaning of a word or the canon of *noscitur a sociis*." *Id*. (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018)). Hence, parties cannot waive reliance on the tools of statutory construction relevant to a preserved legal objection.

**Summary of Argument**

Point One

The dangerous weapon enhancement of U.S.S.G. §2D1.1(b)(1) should not have applied to Estrada. Application Note 11(A), which would apply the enhancement whenever a firearm was "present" unless its connection with the offense was "clearly improbable," should have no bearing on the issue because it does not resolve a part of §2D1.1(b)(1) that remains genuinely ambiguous after applying traditional tools of construction. Here, the traditional legal meaning of "possess[]" (including constructive possession), along with the relevant conduct Guideline, U.S.S.G. §1B1.3(a), clarifies the meaning of "possess[.]" Accordingly, to apply §2D1.1(b)(1), the record must show that Estrada or a particular co-conspirator had knowledge of and the intent and ability to control the firearm.

The record shows no such thing. Estrada denied knowing about the firearm from the beginning. It was registered to Courtney Blackburn, and found on a bed in an unoccupied stash house, three days after his arrest. Another man co-leased the house with Estrada, and phone records revealed a third tenant. There was mail in the house, but nothing with Estrada's name on it. The record does not reveal fingerprint evidence or items found near the firearm that might tie it to Estrada or a particular co-conspirator. The phone does not reveal any communications about

16

a firearm, and the record contains no statements of co-conspirators referencing the firearm. The evidence was thus insufficient to conclude that Estrada or a particular co-conspirator had knowledge of and the intent and ability to control the firearm. Absent such evidence, whether the firearm was foreseeable, or within the scope of and in furtherance of jointly undertaken criminal activity, is immaterial.

Point Two

Even if the dangerous weapon enhancement applied, it does not follow that Estrada was disqualified from the two-level reduction for offenders who, like him, have zero criminal history points. U.S.S.G. §4C1.1. Only the exclusion under §4C1.1(a)(7) could disqualify him, which applies to those who do certain things with firearms, including "possess" them. But unlike the dangerous weapon enhancement, U.S.S.G. §1B1.3(a) does not determine the conduct relevant to the reduction. Section 1B1.3(b) does, and it directs courts to make the determination based only on the "respective Guideline." The subject of §4C1.1(a)(7) is "the defendant," and the verbs do not include "aid," "abet," or "conspire," or implicate jointly undertaken criminal activity, other than the word "induce." The question is thus whether the exclusion encompasses Estrada's personal conduct. The record does not suggest that he constructively possessed the firearm, did anything else with it, or induced anyone else to do so. He therefore qualifies for the reduction.

17

**Argument**

I.    THE DISTRICT COURT ERRED IN APPLYING THE DANGEROUS WEAPON ENHANCEMENT UNDER U.S.S.G. §2D1.1(b)(1) BASED ON APPLICATION NOTE 11(A), WHICH, IN EXPANDING "POSSESS" BEYOND ITS NORMAL LEGAL MEANING, DOES NOT RESOLVE A GENUINELY AMBIGUOUS PART OF THE GUIDELINE.

In overruling Estrada's objection to his §2D1.1(b)(1) enhancement for possessing a dangerous weapon in connection with his offense, ("the dangerous weapon enhancement"), the District Court reasoned "I don't think that he's shown that it's clearly not [sic] improbable that he had a gun." Dist. Ct. dkt. 46 at 6:2-6. The court's language stemmed from Application note 11(A) and this Court's case law interpreting it. The note states "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. §2D1.1, cmt. n. 11(A). According to Circuit law, "once the Government has shown proximity of the firearm to the site of the charged offense, the evidentiary burden shifts to the defense to demonstrate that a connection between the weapon and the offense is 'clearly improbable.' " *United States v. Hall*, 46 F.3d 62, 63 (11th Cir. 1995). Recent clarifications of the deference owed to Guidelines commentary, which are outlined below, show that neither

18

application note 11(A) nor the Circuit law interpreting it[1] remain good law. The District Court thus erred in applying the §2D1.1(b)(1) enhancement based on application note 11(A).

A. Deference to Guidelines Commentary

*Stinson v. United States*, 508 U.S. 36 (1993) effectively made Guidelines commentary binding in most instances. There, the Supreme Court compared Guidelines commentary to agency interpretations of agency rules, which receive "*Auer* deference." *Id*. at 44; *see Auer v. Robbins*, 519 U.S. 452 (1997). Although the comparison was not "precise," it concluded courts should apply the same standard of deference to Guidelines commentary. *Stinson*, 508 U.S. at 44

This standard of deference came from *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945).  The classic formulation, adopted verbatim in *Stinson*, was that courts "should afford the agency's construction of its own regulation 'controlling weight' unless it is 'plainly erroneous or inconsistent with the regulation.' " *United States v. Dupree,* 57 F.4th 1269, 1274 (11th Cir. 2023) (quoting *Seminole Rock*, 325 U.S. at 414). The Supreme Court reaffirmed this standard in *Auer*, 519 U.S. at 452.

---

[1] *Kisor v. Wilkie*, 588 U.S. 558 (2019) abrogates *Hall*, 46 F.3d 62, and its progeny in the same way that this Court found it had abrogated prior Circuit law construing former application note 1 to §4B1.2(b) in *United States v. Dupree,* 57 F.4th 1269, 1278-79 (11th Cir. 2023).

19

More recently, in *Kisor v. Wilkie*, 588 U.S. 558, 570 (2019), it reaffirmed the basic presumption that *Auer* deference rested on – a presumption that "Congress would generally want the agency" that promulgated a regulation "to play the primary role in resolving regulatory ambiguities." But it severely "cabined" the "scope" of this deference, thus eliminating the broad, "reflexive" standard that formerly applied. *Id.* at 574, 580. Thereafter, in *United States v. Dupree*, 57 F.4th 1269, 1278-79 (11th Cir. 2023), this Court held, "to follow *Stinson*'s instruction to treat the commentary like an agency's interpretation of its own rule, we must apply *Kisor*'s clarification of *Auer* deference to *Stinson*." *Id*.

B. *Kisor* Standard of Deference

*Kisor,* 588 U.S. at 574, criticized the old *Auer* standard as a "caricature of the doctrine." Instead of "reflexive[ly]" deferring to agencies, *Kisor* insisted that courts only defer when the agency rule being interpreted is "genuinely ambiguous" – a phrase repeated throughout the opinion. *Id*. at 574. "If uncertainty does not exist, there is no plausible reason for deference." *Id*. at 574-75.

"[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Id*. It must " 'carefully consider' the text, structure, history, and purpose of" the regulation. *Id*. (citation omitted.) These tools may not entirely resolve the ambiguity, but they will "at least establish

20

the outer bounds of permissible interpretation." *Id*. at 576. And to warrant deference, an agency interpretation "must come within the zone of ambiguity that the court has identified after employing all its interpretive tools." *Id*.[2]

C. *Dupree*'s Application of *Kisor* to Former Application Note 1 to U.S.S.G. §4B1.2

In *Dupree*, 57 F.4th at 1277-78, this Court held, based on the *Kiso*r standard, that courts should not defer to a former application note that purported to add conspiracies and attempted offenses to the "controlled substance offense" definition in U.S.S.G. §4B1.2(b). It began with the plain text of the Guideline, which did "not mention conspiracy or attempt or any other inchoate crimes." *Id*. at 1277. That § 4B1.2(b) was definitional, and still did not mention inchoate offenses, was "a strong indicator that the term does not include those offenses." *Id*. It applied the "interpretive canon" that a drafting body " 'acts intentionally when it uses particular language in one section . . . but omits it in another[,]' " noting that the parallel crime of violence definition in U.S.S.G. §4B1.2(a)(1) includes attempts. *Id*.

---

[2] Still, "not every reasonable agency reading of a genuinely ambiguous rule should receive *Auer* deference." *Id*. Instead, the "court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id*. "[I]t must be the agency's 'authoritative' or 'official position,' " "implicate its substantive expertise," and "reflect [its] 'fair and considered judgment[.]' " *Id*. at 577-579 (citations omitted.) These clarifications are not relevant here, because Application Note 11(A) is not a "reasonable agency reading of a genuinely ambiguous rule[.]"

21

at 1278 (quoting *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015)). The canon " 'applie[d] with particular force' " because " 'the provision that includes specific language is in 'close proximity' to the provision that excludes it.' " *Id*.

Finally, this Court rejected the government's argument, based on a broad, secondary dictionary definition of the word "prohibit," that §4B1.2(b) swept inchoate offenses into the Guideline. *Id*. at 1279. It reasoned that this interpretation was not reasonable since "there would be no logical limit to the conduct that would come under the controlled substance offense umbrella." *Id*. It would even include simple drug possession offenses, which would contravene Supreme Court precedent. *Id*. And its prior decision that had used this broad definition of "prohibit" – *United States v. Lange*, 862 F.3d 1290, 1295 (11th Cir. 2017) – was "wrong" because it interpreted the word in light of the application note that, it turns out, did not warrant deference. *Dupree*, 57 F.4th at 1279.

D. Application Note 11(A) Should Not Receive Deference

Section 2D1.1(b)(1) states "(1) If a dangerous weapon (including a firearm) was possessed, increase by 2 levels." Right off the bat, several ambiguities are apparent. The use of the passive tense "was possessed" leaves us guessing as to the subject of the sentence – possessed by whom? Nor does the Guideline tell us anything about when or where the possession should occur. The relevant conduct

22

Guideline, U.S.S.G. §1B1.3(a), clarifies these points, as discussed below. But most significant to the status of application note 11(A) is whether the word "possessed" is genuinely ambiguous.

The traditional tools of statutory construction start with the plain meaning. The American Heritage Dictionary defines "possess" as "a. To have as property; own[,] or "b. *Law*; To have under one's power or control[.]" "possess," THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, available at: https://ahdictionary.com/word/search.html?q=possess (last visited Feb. 26, 2025). "Possess" is also a term of art familiar to bench and bar. In a legal context, a defendant constructively possesses an item when "the defendant (1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over that firearm." *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011)

The Commissioners understood the legal meaning of "possess" when they drafted §2D1.1(b)(1). The legal definition of possession, including constructive possession, significantly narrows any ambiguity in the word. The question becomes whether the plain and legal definitions of "possess" leave a zone of ambiguity that Note 11(A) reasonably fills. *Kisor*, 588 U.S. at 576.

Might there sometimes be uncertainty about what it means to have knowledge of a firearm and the intention and ability to exercise control over it? Perhaps, but constructive possession is a fact-intensive analysis that the courts have fleshed out in countless decisions. And at any rate, application note 11(A), does not purport to clarify any narrow ambiguities that might arise in particular factual contexts. It simply replaces constructive possession with a much broader concept.

Note 11(A) states the "enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." This expands possession beyond both the plain meaning and the legal meaning of the term. A weapon can be present, though the defendant did not know about it, have power over it and have the intention to control it. One might even infer the weapon was connected with the offense, but that still does not prove the defendant was in constructive possession of the weapon.

Of course, under U.S.S.G. §1B1.3(a), enhancements can also apply based on the acts of co-defendants. So, even under the normal legal meaning of "possess," a defendant need not personally be in constructive possession of a weapon to receive the §2D1.1(b)(1) enhancement. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured,

24

or willfully caused by the defendant[.]" §1B1.3(a)(1)(A). With respect to jointly undertaken criminal activity, the enhancement applies if:

> "the government . . . prove[s] by a preponderance of the evidence: (1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant."

*United States v. Gallo*, 195 F.3d 1278, 1284 (11th Cir. 1999).

These sources leave no ambiguity for application note 11(A) to resolve. Rather than resolve a genuine ambiguity, note 11(A) effectively broadens the traditional legal meaning of this word, beyond even the already broad relevant conduct Guideline. It is therefore not entitled to deference under *Stinson* and *Kisor*. Instead, to apply the enhancement, a District Court must determine that the defendant or co-conspirator actually or constructively possessed the firearm, and was part of Estrada's jointly undertaken criminal activity based on the *Gallo* test. By overruling Estrada's objection based on Application Note 11(A), the District Court erred.

25

E.  The Proffered Evidence Does Not Show Estrada Constructively Possessed the Firearm

Notwithstanding the court's error, it might have been right for the wrong reasons. *See, e.g., Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1137 (11th Cir. 2019). The firearm was not found in anyone's actual possession. So the enhancement could only apply (1) If Estrada constructively possessed the firearm found in the Murray Lake house, or (2) a co-conspirator foreseeably constructively possessed the firearm within the scope of and in furtherance of the jointly undertaken criminal activity. The proffered evidence does not establish that Estrada or a particular co-conspirator had knowledge of and the ability and intention to control the firearm. Hence, it becomes moot whether such constructive possession, if proven, would have been reasonably foreseeable to him and within scope of or in furtherance of his jointly undertaken criminal activity.

In *United States v. Garcia-Jaimes*, 484 F.3d 1311, 1322-23 (11th Cir. 2007) (subsequent history in footnote)[3], this Court found insufficient evidence that the leader of a vast drug conspiracy, Roberto, who stayed in Texas or Mexico during

---

[3] *United States v. Garcia-Jaimes*, 484 F.3d 1311, 1322–23 (11th Cir. 2007), *cert. granted, judgment vacated sub nom. Nunez-Virraizabal v. United States*, 553 U.S. 1091, 128 S. Ct. 2901, 171 L. Ed. 2d 839 (2008), *and cert. granted, judgment vacated sub nom. Moreno-Gonzalez v. United States*, 553 U.S. 1091, 128 S. Ct. 2901, 171 L. Ed. 2d 839 (2008), a*nd opinion reinstated in part sub nom. United States v. Moreno-Gonzalez*, 313 F. App'x 215 (11th Cir. 2008)

the conspiracy, did not have the intent or ability to exercise control over the particular firearms seized in a stash house in Atlanta. Although this opinion was twice overturned by the Supreme Court on other grounds, this Court ultimately reinstated this part of the opinion, along with its vacatur of Roberto's conviction of possessing a firearm in furtherance of a drug trafficking offense.

In contrast, in *United States v. Isnadin*, 742 F.3d 1278, 1307-08 (11th Cir. 2014), this Court found sufficient evidence that one of the co-defendants, Gustama, constructively possessed a firearm in furtherance of a drug trafficking conspiracy. Gustama's overhearing a co-conspirator say that they "had enough 'fire' to handle the job[,]" which was to "acquire" cocaine, showed his knowledge. *Id*. That a firearm was found lying near Gustama upon his arrest further showed he "conspired to use a firearm in connection with a drug trafficking offense. *Id*. at 1308.

*United States v. Gunn*, 369 F.3d 1229 (11th Cir. 2004), involved a conspiracy to rob a stash house of narcotics. This Court found the evidence was sufficient to show constructive possession by the leader of the conspiracy, as well as by a key player in organizing the conspiracy who arrived at the robbery site in the car where guns were found. *Id*. at 1235-36. Notwithstanding the nature of the conspiracy, however, it did not show constructive possession on the part of a co-conspirator

27

who arrived in a separate car and was not a "principal player in the conspiracy." *Id*. at 1236.

Most instructive is *Perez*, 661 F.3d at 576-578, which also involved a conspiracy to commit an armed robbery. One co-defendant, Del Monte, argued the evidence was insufficient to establish he constructively possessed the firearms found in a car belonging to an informant pretending to be a co-conspirator. *Id*. at 577. This Court disagreed. The evidence establishing his knowledge was (1) that the nature of the conspiracy required robbing armed guards of a large quantity of cocaine by overcoming them with force; (2) a statement in Del Monte's presence that " 'things [would] get hot' if they killed one of the guards[]" and Del Monte's nonetheless indicating he wanted to take part in the robbery; (3) conversations in Del Monte's presence in a very small, one-room apartment discussing the specific guns to be provided; (4) that "guns were displayed at the time the group began to 'mobilize[]' for the robbery"; and (5) evidence that the co-conspirators "consciously waited to depart for the robbery until they received word that the guns had been placed in the CI's car for transportation to the robbery site." *Id*. at 577-578.

Still, this Court recognized that general "awareness of the guns was not sufficient, by itself, to establish . . . constructive possession[.]" *Id*. at 578. But it concluded, even if he did not personally intend to use a firearm, the evidence

28

recounted above established that his co-conspirators so intended, which sufficed to show that Del Monte intended to exercise dominion and control over the guns "through others" by his "direct involvement in a criminal enterprise centered around the use of the firearms." *Id*.

Here, none of the undisputed proffer or stipulated facts put Mr. Estrada in the presence of the firearm. There was no gun on him, or in the Hightower house where he was arrested, notwithstanding the presence of a significant quantity of methamphetamine that one might consider protecting with a firearm.

Constructive possession of the firearm required that Estrada know of the firearm and had the intent and ability to exercise dominion and control over it. As to the former, Estrada denied knowing about the firearm from the beginning. *See* R45 at 12:19-20. Even if his name on the lease were enough to establish his power over anything found in the house, which is debatable, particularly in the case of jointly leased, and, at the time of the search, *unoccupied*, property, it would not show he knew about the particular firearm, let alone intended to exercise control over it.

Estrada surely did not have the ability to exercise control over it when it was found, because he was in custody. Moreover, there was no evidence to suggest how long the firearm had been there. It would be pure speculation to assume it

had been there, lying in the open on an air mattress, at a time when he could have exercised control over it. Indeed, it may be more reasonable to assume that a person does not generally leave a firearm like that for very long, suggesting it may belong to a co-conspirator who had been there more recently.

The most that can be said about Estrada's connection to the firearm was that it was found in a house for which he co-signed a lease, and that it was found along with a large quantity of methamphetamine and materials related to the conspiracy that he admitted to. While these facts were certainly relevant to his guilt for the conspiracy, under the broad basis for conspiracy liability established by *Pinkerton v. United States*, 328 U.S. 640 (1946), they do not show specifically that he was in constructive possession of the firearm, or for that matter anything else found in the Murray Lake house. He did not need to be in constructive possession of these things to be liable for the overall conspiracy.

He did, however, need to be in constructive possession of them "either personally or though others[,]" *Perez*, 661 F.3d at 576, for the District Court to apply the dangerous weapon enhancement. The general foreseeability of firearms is not the same as the specific knowledge that a co-conspirator possesses a firearm, along with that co-conspirator's intent and ability to exercise control over it. The mere possibility that a co-conspirator might on some occasion be armed is a far cry from

a conspiracy to rob armed guards, which is necessarily "centered around the use of firearms." *Id.*; *cf. United States v. Villareal*, 613 F.3d 1344, 1359 (11th Cir. 2010) (applying dangerous weapon enhancement to defendant who sent armed associates to collect drug debts). Foreseeability is not enough, absent at least some specific reference to firearms in Estrada's presence, as occurred in *Isnadin*, 742 F.3d at 1307-08, and *Perez*, 661 F.3d at 576-578.

Surely it was foreseeable to the leader of the vast drug conspiracy in *Garcia-Jaimes*, 484 F.3d 1311, 1322-23, that his underlings protect his large quantities of drugs with firearms. It would be difficult to conclude he did not specifically intend them to arm themselves. But that general knowledge did not sufficiently tie him to particular firearms found in a particular stash house, for this Court to conclude he constructively possessed those firearms.

No one claims Estrada was a leader of the conspiracy. But whether or not he was generally aware that his co-conspirators might have guns, the evidence did not show he had specific knowledge of the particular gun found, or that a particular co-defendant had the intent or ability to exercise control over the gun. There was no one in the house where the firearm was found. No evidence was offered tying the firearm to Estrada, or to *any* particular person. Nothing on the record suggests the gun was dusted for fingerprints, found near identifying documents or clothes that

31

might fit a particular person. Nothing suggests a co-defendant mentioned a gun. None of the surveillance of him, or the contents of his cell phones, revealed his discussing with his co-conspirators a gun, or the need for one. And the gun was registered to Courtney Blackburn.

At bottom, the general point that firearms are a foreseeable part of a large drug conspiracy does not suffice to hold that every co-conspirator possesses that firearm. Constructive possession case law is more discriminating than that. Without more, the District Court could not have been right for the wrong reasons. The evidence did not show Estrada's constructive possession of the firearm, and because application note 11(A) should have no bearing on the analysis, the District Court erred in applying the dangerous weapon enhancement to Estrada.

II.    THE DISTRICT COURT ERRED IN FAILING TO APPLY THE TWO-LEVEL REDUCTION UNDER U.S.S.G. §4C1.1 APPLICABLE TO OFFENDERS WITH ZERO CRIMINAL HISTORY POINTS.

The District Court silently overruled Estrada's objection to the failure of his PSR to apply the two-level reduction of U.S.S.G. §4C1.1, applicable to offenders with zero criminal history points, ("the zero-point reduction"), *see* R29 at 2, apparently based on its finding that Estrada possessed a dangerous weapon in

connection with his offense pursuant to §2D1.1(b)(1). This was error, whether or not the court correctly applied the dangerous weapon enhancement.

Section 4C1.1 provides for a two-level reduction in a defendant's offense level if they did not have any criminal history points, unless that defendant is disqualified based on one of ten additional factors, which cover certain types of offenses like "sex offense[s]," §4C1.1(a)(5), certain enhancements such as the aggravating role enhancement of U.S.S.G. §3B1.1, §4C1.1(a)(10), or certain types of conduct such as "us[ing] violence or credible threats of violence in connection with the offense[.]" §4C1.1(a)(3).

Estrada did not have any criminal history points, had no automatically disqualifying enhancements, and was not convicted of a categorically disqualifying offense. R32 at ¶38. Only one conduct-based disqualifying factor potentially applied to him. The conduct relevant to the court's (erroneous) decision to apply the §2D1.1(b)(1) dangerous weapon enhancement, might also suggest he was disqualified from the reduction under §4C1.1(a)(7), which precludes the reduction if the defendant "possess[ed], receive[d], purchase[d], transport[ed], transfer[red], s[old], or otherwise dispose[d] of a firearm or other dangerous weapon (or induce[d] another participant to do so) in connection with the offense[.]" But, just as this Court has recognized that the dangerous weapon enhancement does not

33

categorically preclude safety valve relief, it does not categorically prevent the zero-point reduction. *See, e.g., United States v. Carillo-Ayala*, 713 F.3d 82, 91 (11th Cir. 2013) ("Not all defendants who receive the enhancement under § 2D1.1(b)(1) are precluded from relief under subsection (a)(2) of the safety valve.")

Whether or not this Court agrees with Estrada that he should not have received the dangerous weapon enhancement, the text of §2D1.1(b)(1) is much broader than the text of §4C1.1(a)(7). It follows as a matter of logic that there will be circumstances in which a person qualifies for the enhancement, but also qualifies for the reduction.

Indeed, if the Commission meant for the dangerous weapon enhancement to categorically disqualify persons from the zero-point reduction, it would have made explicit reference to §2D1.1(b)(1), like it did to other disqualifying enhancements. *See* §4C1.1(a)(2) (referencing "§3A1.4 (Terrorism)"); §4C1.1(a)(9) (referencing "§3A1.1 (Hate Crime Motivation or Vulnerable Victim" and "3A1.5 (Serious Human Rights Offense)"); §4C1.1(a)(10) (referencing "§3B1.1 (Aggravating Role)"). Instead, it defined the qualification based on certain conduct, and using language distinct from that in §2D1.1(b)(1). This makes clear that Estrada might have qualified for the reduction even if he correctly received the enhancement.

Of course, if this Court agrees with Estrada on his first point, it would be difficult to conclude he should not also receive the zero-point reduction. Estrada argues that the records did not suffice to show that either he or any particular co-conspirator had knowledge of, and the ability and intent to control, the firearm found on a bed in an unoccupied house. It follows that Estrada himself did not "possess" the firearm within the meaning of §4C1.1(a)(7) – a word that this Court should also interpret based on its traditional legal meaning. And of course, no one claims Estrada's conduct covers the other verbs in §4C1.1(a)(7) – "receive, purchase, transport, transfer, sell, [induce,] or otherwise dispose of" the firearm.

On the other hand, even if Estrada correctly received the dangerous weapon enhancement, it does not follow that the court correctly denied him the zero-point reduction, for several reasons. First, the relevant conduct Guideline does not apply in the same way to Chapter Four of the Guidelines as it does to Chapter Two. The former is governed by U.S.S.G. §1B1.3(b), which states "Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines." In contrast, §1B1.3(a) dictates that

> (ii) specific offense characteristics . . . shall be determined on the basis of . . . (1)(A) all acts and omissions committed, aided, abetted, counseled,

35

commanded, induced, procured, or willfully caused by the defendant; and . . . (B) . . . all acts and omissions that were—(i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]

Put simply, §1B1.3 instructs courts to cast a much wider net in determining the conduct relevant to the base offense level and specific offense characteristics like the dangerous weapon enhancement, than in determining the conduct relevant to the zero-point reduction. Subsection (a) requires that sentencing accountability incorporate, among other things, aiding and abetting liability and jointly undertaken criminal activity, while subsection (b) requires courts to simply stick to the "respective guidelines[]" at issue. *Cf. United States v. Zavalza-Rodriguez*, 379 F.3d 1182, 1188 (10th Cir. 2004) ("For purposes of § 2D1.1 constructive possession, either physical proximity or participation in a conspiracy, is sufficient to establish that a weapon 'was possessed.[,]' " while "[f]or purposes of § 5C1.2 we look to the defendant's own conduct in determining whether . . . the weapon was not possessed 'in connection with the offense.' ")

The "respective guideline" in this case is §4C1.1(a)(7), which discusses only the defendant's personal conduct. It asks whether *the defendant* "possess[ed],

36

receive[d], purchase[d], transport[ed], transfer[red], s[old], or otherwise dispose[d] of a firearm or other dangerous weapon[.]" *Id*. The only verb touching on the actions of another is that it also disqualifies a defendant who "induce[d] another participant to do so." *Id*. And again, no one claims Estrada induced anyone. Section 4C1.1(a)(7) notably does not use the words in §1B1.3(a) "aided, abetted, counseled, commanded, . . . , procured, or willfully caused[,]" and it makes no reference to "jointly undertaken criminal activity." The Commission is a sophisticated rule-making body that knows very well the significance of these words, and it chose not to use them.

Moreover, unlike the passive phrase "was possessed" in §2D1.1(b)(1), which opens that Guideline to an interpretation that sweeps in some acts of others, §4C1.1(a)(7) has a subject and uses the active voice ("the defendant did not possess, . . . [.]") Again, if the Commission wished this particular exclusion from the zero-point reduction to be as broad as the dangerous weapon enhancement, it could have used similar syntax to the dangerous weapon enhancement, or it could have said something like "the defendant or his co-conspirators." It chose more limited language, indicating a more limited exception to the reduction, and this Court must honor that choice.

Hence, the dangerous weapon enhancement contains materially different text than the zero-point reduction, and applies based on different relevant conduct. It follows that the District Court erred to the extent it failed to give Estrada the benefit of the zero-point reduction based on its previous decision that the dangerous weapon enhancement applied to him.

Again, the record in this case does not show that Estrada had knowledge of, and the intent and ability to control a firearm registered to another and found three days after his arrest on a bed in a stash house that contained multiple items of mail, none of which belonged to him, R29 at 2, and that had two additional tenants, R30 at 5. It does not show that he induced another person to possess the firearm, or did anything else with the firearm. Hence, even if the broader conduct relevant to the dangerous weapon enhancement shows enough to apply that enhancement to him, Estrada still qualified for the two-level reduction under U.S.S.G. §4C1.1.

## Conclusion

For the foregoing reasons, this Court should reverse and vacate the defendant's sentence and order the court to resentence him based on a Guidelines range calculated without the dangerous weapon enhancement and with the zero-point reduction, according to which his offense level should be 35, and his Guidelines imprisonment range 168 to 210 months.

38

Dated this 3rd day of March, 2025.

Respectfully submitted,

*s/ Jonathan Dodson*

JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail:  jonathan_dodson@fd.org

**Certificate of Compliance**

Pursuant to Fed. R. App. P. 32(a)(7)(C), I, Jonathan Dodson, appellate counsel for Estrada, hereby certify that the number of words in this brief, as counted by the Microsoft Office Word processing system, according to the method described in 11th Cir. R. 32-4, is **8,258** words; which is less than the 13,000 allowed for appellate initial briefs by Fed. R. App. P. 32(a)(7)(B)(i).

**Certificate of Service**

I, Jonathan Dodson, appellate counsel of record for the Appellant, Victor Estrada, hereby certify that I have, on this 3rd day of March, 2025, filed the foregoing *Appellant's Initial Brief* with the Clerk of Court using the Eleventh Circuit's CM/ECF system, which will send electronic notification of filing to counsel of record. I also certify that I caused a copy of the foregoing *Appellant's Initial Brief* to be served in paper format to Estrada by placing a copy of the same in the United States Mail, postage prepaid, addressed to: Victor Uriel Diego Estrada, Fed. Reg. No. 87002-510, FCI Gilmer, P.O. Box 6000, Glenville, WV 26351. I further certify that I caused the foregoing submission to be dispatched for filing with the Clerk of Court by Federal Express overnight delivery.

*s/ Jonathan Dodson*
JONATHAN R. DODSON
FL Bar Number: 0050177
Assistant Federal Defender

Federal Defenders of the
Middle District of Georgia, Inc.
440 Martin Luther King, Jr. Boulevard, Suite 400
Macon, Georgia 31201
Tel: (478) 743-4747
Fax: (478) 207-3419
E-mail:  jonathan_dodson@fd.org